UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| CAMEUS BARNETT, | ) |
|---|---|
| Plaintiff, | ) |
| v. | ) No. 1:18-cv-01716-JRS-MPB |
| WEXFORD HEALTH SOURCES, INC., et al. | ) |
| Defendants. | ) |

**Order Granting Motion for Summary Judgment
and Directing Entry of Final Judgment**

Plaintiff Cameus Barnett, an inmate at Pendleton Correctional Facility ("Pendleton"), brought this civil rights action pursuant to 42 U.S.C. § 1983 alleging violations of his Eighth Amendment rights. Mr. Barnett also asserts a breach of contract claim and an Indiana tort claim for intentional infliction of emotional distress. Mr. Barnett alleges that the defendants, Dr. Talbot and Wexford of Indiana, LLC ("Wexford"), delayed medical treatment related to a back injury Mr. Barnett sustained on April 21, 2017.

The defendants seek resolution of the claims alleged against them through summary judgment. They argue that Mr. Barnett's constitutional rights were not violated, that Mr. Barnett is not a third-party beneficiary to the contract between Wexford and the Indiana Department of Correction and that he has not sustained damages as a result of the alleged breach of that contract, and that Dr. Talbot is not liable under Indiana tort law because he did not act intentionally. Mr. Barnett has not responded to the motion for summary judgment, and the time for doing so has passed. For the reasons explained below, the defendants are entitled to judgment as a matter of law.

# I.
## Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).

To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court views the record in the light most favorable to the non-moving party that draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no

"genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Not every factual dispute between the parties will prevent summary judgment, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

As noted above, Mr. Barnett has not responded to the motion for summary judgment, and the deadline for doing so has passed. The consequence is that Mr. Barnett has conceded the defendants' statement of undisputed facts. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission."); *see also* S.D. Ind. Local Rule 56-1(b) ("A party opposing a summary judgment motion must . . . file and serve a response brief and any evidence . . . that the party relies on to oppose the motion. The response must . . . identif[y] the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment."). Mr. Barnett's failure to respond, while deemed an admission of the defendants' statement of facts, nevertheless does not alter the summary judgment standard. This does not alter the standard for assessing a Rule 56 motion, but it does reduce "the pool" of facts from which inferences relative to the motion may be drawn. *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997).

Finally, although *pro se* filings are construed liberally, *pro se* litigants such as Mr. Barnett are not exempt from procedural rules. *See Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008) (noting that "*pro se* litigants are not excused from compliance with procedural rules"); *Members v. Paige*, 140 F.3d 699, 702 (7th Cir. 1998) (stating that procedural rules "apply to uncounseled litigants and must be enforced").

## II.
## Statement of Undisputed Facts

The following statement of facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Mr. Barnett, despite his failure to respond, as the non-moving party to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

On April 21, 2017, Mr. Barnett injured himself while playing basketball. Dkt. 45-2 at 28:17-25. While walking to a kiosk machine, he felt tightening in his back and fell to the ground after his legs buckled. Dkt. 45-3 at 187.

Mr. Barnett was taken to the health care unit and was evaluated by Nurse Practitioner Wambui Murage. *Id.* Nurse Practitioner Murage ordered that Mr. Barnett immediately receive a Toradol injection, as well as a muscle relaxer. *Id.* She re-examined Mr. Barnett an hour later, and he reported that his pain had lessened, but he was still experiencing numbness and tingling. *Id.* Nurse Practitioner Murage ordered an x-ray, which revealed abdominal gas and stool, but no other abnormality. She gave Mr. Barnett a prescription for a muscle relaxer and an order for Toradol injections as needed. *Id.* at 187-89. Mr. Barnett received a second Toradol injection during the evening of April 21, 2017. *Id.* at 181-82.

Nurse Practitioner Murage had a follow-up visit with Mr. Barnett on April 24, 2017. Dkt. 45-3 at 177-78. Although his symptoms had improved, Mr. Barnett reported a sudden onset of back pain. Nurse Practitioner Murage provided a medical lay-in for two weeks, continued the order for a muscle relaxer, and prescribed an anti-inflammatory medication. *Id.*

Mr. Barnett had another appointment with Nurse Practitioner Murage on May 15, 2017. Dkt. 45-3 at 172-74. He stated that his symptoms had improved, but persisted. Mr. Barnett asked that the prescription for the muscle relaxer be extended, so Nurse Practitioner Murage ordered two more weeks of it. *Id.* When Mr. Barnett returned to the health care unit on May 30, 2017, again complaining of back pain, an order was entered for a practitioner evaluation. Dkt. 45-3 at 168-69.

Dr. Talbot evaluated Mr. Barnett for the first time on May 31, 2017. Dkt. 45-3 at 165-67. At this visit, Dr. Talbot evaluated Mr. Barnett's active and passive range of motion in his hips and legs and reviewed a prior x-ray of Mr. Barnett's lumbar spine. *Id.* After finding no significant abnormalities, Dr. Talbot gave Mr. Barnett a Toradol injection, continued the order for a muscle relaxer, and provided an exercise plan. *Id.*

On July 6, 2017, Mr. Barnett saw Nurse Practitioner Murage and reported persistent numbness in his left leg and periodic throbbing in his lower back. He also stated that the muscle relaxers no longer provided relief. Dkt. 45-3 at 159-61. Nurse Practitioner Murage prescribed Prednisone and submitted a request for an MRI of Mr. Barnett's lumbar spine. *Id.* at 160. After a collegial discussion, it was decided that Mr. Barnett would be referred for physical therapy before receiving an MRI. Dkt. 45-3 at 154-55.

Nurse Murage informed Mr. Barnett of the treatment plan for physical therapy on July 26, 2017. Dkt. 45-3 at 148-50. In light of his complaints of significant discomfort, Nurse Practitioner Murage prescribed Tramadol for pain. *Id.* at 150.

Mr. Barnett was evaluated by a physical therapist on July 27, 2017. Dkt. 45-3 at 144. The physical therapist attempted a number of exercises with Mr. Barnett, but he could not tolerate any of them. *Id.* Consequently, the physical therapist determined that Mr. Barnett could not tolerate physical therapy and recommended that he receive an MRI. *Id.*

Mr. Barnett met with Dr. Talbot on August 8, 2017, for a follow-up appointment. Dkt. 45-3 at 140-41. Dr. Talbot noted that Mr. Barnett was approved for an MRI and, after evaluating Mr. Barnett, recommended that the MRI include Mr. Barnett's left hip. *Id.* at 140. He was concerned about a potential nerve impingement of the left hip. Dkt. 45-1 at ¶ 14.

Mr. Barnett received an MRI on August 21, 2017. Dkt. 45-1 at ¶ 15. The MRI showed a disc protrusion at the joint between the L5 and S1 vertebrae with a minimal nerve root impingement at S1. *Id.* It also showed a larger disc protrusion at the joint between the L4 and L5 vertebrae and a nerve root impingement at L5. *Id.* Nurse Practitioner Murage reviewed the MRI findings and ordered a continuation of the Tramadol and a wheelchair for outdoor activities as needed. Dkt. 45-3 at 121-26. She also submitted a referral for Mr. Barnett to see a neurosurgeon. *Id.*

Nurse Practitioner Murage met with Mr. Barnett on September 19, 2017, explained the results of the MRI, and informed Mr. Barnett that he was awaiting a neurosurgery consult. Dkt. 45-3 at 117-18. Mr. Barnett reported that the Tramadol was relieving his pain and that he was trying to walk without using the wheelchair as much as possible. *Id.* Nurse Practitioner Murage continued the Tramadol prescription. *Id.*

Dr. Talbot evaluated Mr. Barnett on October 9, 2017, after Mr. Barnett requested a double mattress and back brace. Dkt. 45-3 at 110-11. Although Dr. Talbot did not approve the double mattress or back brace, he did order a three-month prescription of Neurontin to help with the pain. *Id.*

Nurse Practitioner Murage had a follow-up visit with Mr. Barnett on October 20, 2017, after an emergency signal was called because he was unresponsive. Dkt. 45-3 at 99-101. Mr. Barnett reported that he was deep asleep, not unresponsive, and admitted that he had been working

full-time in the kitchen at Pendleton. *Id.* Mr. Barnett claimed that he had not fallen, but that he still experienced discomfort. *Id.*

A neurosurgeon, Dr. Lin, evaluated Mr. Barnett on November 7, 2017. Dkt. 45-1 at ¶ 20. Dr. Lin concluded that Mr. Barnett was likely experiencing L5 radiculopathy. *Id.* They discussed different treatment options, including physical therapy and surgery. Dkt. 45-2 at 38:25-39:6. Mr. Barnett elected to try physical therapy first. *Id.*; dkt. 45-2 at 40:24-41:1. When Mr. Barnett returned to Pendleton, Nurse Practitioner Murage ordered physical therapy. Dkt. 45-3 at 111-12.

Dr. Talbot met with Mr. Barnett on December 5, 2017, after Mr. Barnett submitted a health care request form. Dkt. 45-3 at 70-71. Dr. Talbot submitted another referral for physical therapy as a result of this visit. Dkt. 45-3 at 67-69.

Mr. Barnett met with the physical therapist on December 7, 2017. Dkt. 45-3 at 65. The physical therapist noted that Mr. Barnett was able to tolerate more exercises. *Id.* They completed exercises, and the physical therapist instructed Mr. Barnett to continue doing the exercises that did not worsen his symptoms. *Id.* The physical therapist noted that Mr. Barnett was "much improved" since his last physical therapy appointment. *Id.*

Mr. Barnett had another physical therapy appointment on December 14, 2017. Dkt. 45-3 at 64. He stated that he was not noticing measurable improvement. *Id.* The physical therapist performed the exercises with Mr. Barnett and instructed him on a particular exercise to ease his discomfort. *Id.* He was to follow-up in two weeks. *Id.*

When Mr. Barnett saw the physical therapist again on January 9, 2018, he reported that his pain was more under control. Dkt. 45-3 at 56. The physical therapist and Mr. Barnett agreed that he could continue to do the exercises on his own and physical therapy appointments were no longer necessary. *Id.*

7

Mr. Barnett next met with Dr. Talbot on February 5, 2018, after submitting a health care request for more Neurontin. Dkt. 45-3 at 42-43. Because Pendleton was experiencing a large amount of diversion of Neurontin, Dr. Talbot prescribed Pamelor for Mr. Barnett's nerve pain. *Id.* Dr. Talbot ordered a follow-up evaluation in six weeks to determine if further evaluation, medications, or referrals were needed. *Id.* Mr. Barnett returned to the health care unit ten days later complaining that the Pamelor was ineffective, and Dr. Talbot increased the dosage. Dkt. 45-3 at 40-41.

On February 21, 2018, Mr. Barnett met with Dr. Talbot after submitting a health care request stating that he would like to return to the neurosurgeon for surgery. Dkt. 45-3 at 30-31. Although Dr. Talbot doubted that surgery would help Mr. Barnett, he submitted a referral for Mr. Barnett to see Dr. Lin again. *Id.* He also ordered a ninety-day restriction on recreation and continued the Pamelor prescription. *Id.*

Dr. Talbot met with Mr. Barnett on March 8, 2018, because Mr. Barnett wanted his restriction removed. Dkt. 45-3 at 21-22. Dr. Talbot discontinued the recreation restriction and permitted Mr. Barnett to participate in light work duty with a lifting restriction of ten pounds. *Id.*

Mr. Barnett again met with a neurosurgeon on March 13, 2018, and decided to proceed with surgery. Dkt. 45-1 at ¶ 31. He received a surgical microdiscectomy on April 3, 2018. Dkt. 45-1 at ¶ 33.

On April 6, 2018, Dr. Talbot evaluated Mr. Barnett upon his return to Pendleton. Dkt. 45-3 at 1-3. He ordered a wheelchair permit for long distances, a cane permit, a bottom-bunk pass, and a low gallery permit. *Id.* Dr. Talbot also directed a follow-up with the neurosurgeon, a "short course" of Tramadol for pain, and a continuation of Pamelor. *Id.*

Mr. Barnett had a follow-up evaluation with the neurosurgeon on April 23, 2018. Dkt. 45-1 at ¶ 35. He reported no more pain in his left leg and that he was regaining strength. *Id.* The neurosurgeon concluded that Mr. Barnett's L5 radiculopathy was resolved. *Id.*

### III.
### Analysis

Mr. Barnett asserts four claims in his complaint: 1) Dr. Talbot exhibited deliberate indifference to Mr. Barnett's serious medical needs by delaying treating his back pain; 2) Wexford has an unconstitutional practice of improperly diagnosing and treating inmates; 3) Wexford breached its contract with the Indiana Department of Correction ("IDOC"), a contract of which Mr. Barnett is allegedly a sub-party; and 4) Dr. Talbot intentionally inflicted emotional distress on Mr. Barnett by failing to properly treat his back pain. Dkt. 2; *see also* dkt. 5 at 2-3. These claims will be addressed separately.

**A. Deliberate Indifference**

Because Mr. Barnett was a prisoner during all relevant periods, his medical treatment is evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning they must take reasonable measures to guarantee the safety of the inmates and ensure that they received adequate food, clothing, shelter, and medical care. *Famre v. Brennan*, 511 U.S. 825, 834 (1994). "To determine if the Eighth Amendment has been violated in the prison medical context, [the Court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether

the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (en banc). To show deliberate indifference, "a plaintiff does not need to show that the official intended harm or believed that harm would occur," but "showing mere negligence is not enough." *Id.* at 728. Instead, a plaintiff must "provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Id.*

The parties do not dispute that Mr. Barnett's medical condition was objectively serious. Thus, only the second element is at issue for Mr. Barnett's claim against Dr. Talbot—whether Dr. Talbot was deliberately indifferent to that serious medical condition.

To show deliberate indifference, Mr. Barnett must establish that Dr. Talbot "knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728. The undisputed evidence shows that, rather than disregarding Mr. Barnett's back pain, Dr. Talbot continued to evaluate Mr. Barnett and attempted multiple treatment options before referring Mr. Barnett to an outside neurosurgeon.

As detailed above, Dr. Talbot initially evaluated Mr. Barnett on May 31, 2017, after Mr. Barnett's consultations with Nurse Practitioner Murage did not resolve his complaints of pain. At the initial evaluation, Dr. Talbot assessed Mr. Barnett's range of motion in his hips and legs and, even though he found no significant musculoskeletal abnormalities, administered a Toradol injection and continued a prescription for a muscle relaxer. Dr. Talbot also provided Mr. Barnett with an exercise plan to help alleviate his pain.

Mr. Barnett met with Nurse Practitioner Murage and attempted physical therapy before seeing Dr. Talbot again on August 8, 2017. At this appointment, Dr. Talbot increased the scope of the previously-approved MRI based on his further evaluation of Mr. Barnett. Upon receipt of the MRI results, Nurse Practitioner Murage submitted a referral for Mr. Barnett to see a neurosurgeon. While Mr. Barnett was waiting on his consultation with the neurosurgeon, Dr. Talbot again

10

evaluated Mr. Barnett based on his complaints of pain and ordered a three-month prescription for Neurontin, a pain medication often given for nerve discomfort.

Dr. Talbot met with Mr. Barnett after his appointment with the neurosurgeon, and they discussed Mr. Barnett's decision to try physical therapy rather than surgery. At this appointment, Dr. Talbot re-submitted a request for physical therapy, which Mr. Barnett completed with some success.

When Mr. Barnett again complained of pain after completing physical therapy, Dr. Talbot prescribed a different pain medication, Pamelor, and ordered a follow-up appointment to ensure no other treatment was needed. Mr. Barnett reported experiencing pain prior to the scheduled follow-up appointment, and Dr. Talbot evaluated him and increased the dosage of Pamelor. When Mr. Barnett asked to return to the neurosurgeon, Dr. Talbot submitted the request for a referral back to the neurosurgeon. After consultation with the neurosurgeon, Mr. Barnett elected to proceed with surgery, and Dr. Talbot submitted a request for surgery, which occurred less than a month later. No reasonable jury could conclude based on this evidence that Dr. Talbot was deliberately indifferent to Mr. Barnett's back pain.

Even if Mr. Barnett's claim is predicated on a delay in treatment—the approximately five-month period between Mr. Barnett's injury and submission of a referral for Mr. Barnett to be seen by a neurosurgeon—Dr. Talbot is still entitled to summary judgment. "Delaying treatment, even if not life threatening, can be evidence of deliberate indifference." *Wilson v. Adams*, 901 F.3d 816, 822 (7th Cir. 2018); *See Petties*, 836 F.3d at 730 ("[A]nother type of evidence that can support an inference of deliberate indifferent is an inexplicable delay in treatment which serves no penological interest."). However, "[t]o show that a delay in providing treatment is actionable under the Eighth

11

Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties*, 836 F.3d at 730-31.

Here, Mr. Barnett has not shown that the delay exacerbated his injury or unnecessarily prolonged his pain. In fact, after meeting with the neurosurgeon, Mr. Barnett elected to continue the treatment plan that was already in place; he chose to try physical therapy again rather than undergo surgery. Based on this evidence, no reasonable jury would conclude that any delay in Mr. Barnett's referral to a neurosurgeon was due to any deliberate indifference on Dr. Talbot's part. Indeed, Dr. Talbot attempted several different treatment options during the time between Mr. Barnett's injury and his referral to a neurosurgeon.

For these reasons, Dr. Talbot is entitled to summary judgment on Mr. Barnett's Eighth Amendment claim regarding the treatment of his back pain.

**B. Policy or Practice**

Next, Mr. Barnett alleges that Wexford violated the Eighth Amendment by establishing a policy or practice of improperly diagnosing and treating prisoners. Wexford is "treated the same as a municipality for liability purposes under § 1983." *See Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010) (holding that a corporation that contracted with a jail to provide health services is "treated the same as municipalities for liability purposes in a § 1983 action"). Thus, to hold a private corporation liable under § 1983, a plaintiff must establish that the alleged "constitutional violation was caused by an unconstitutional policy or custom of the corporation itself." *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). If a plaintiff provides "no evidence of an unconstitutional policy or custom of Wexford itself, [] precedents doom his claim against the corporation." *Id.*

Although Mr. Barnett alleges that Wexford has a policy or practice of improperly diagnosing and treating prisoners' medical conditions, he provides no evidence in support of his allegation. Thus, his claim against Wexford must fail as a matter of law and Wexford is entitled to summary judgment on Mr. Barnett's Eighth Amendment claim that Wexford had a policy or practice of improperly diagnosing and treating medical conditions.

### C. Breach of Contract

Mr. Barnett claims that Wexford breached its contract with IDOC by failing to provide medical care to prisoners. He alleges that he is a third-party beneficiary to that contract. Dkt. 2 at 9-10.

It is well-settled law that "[t]he parties to a contract are the ones to complain of a breach, and if they are satisfied with the disposition which has been made of it and of all claims under it, a third party has no right to insist that it has been broken." *Harold McComb & Son, Inc. v. JPMorgan Chase Bank, NA*, 892 N.E.2d 1255, 1258 (Ind. Ct. App. 2008) (internal quotation omitted). In Indiana, "only the parties to a contract, those in privity with the parties, and intended third-party beneficiaries under the contract may seek to enforce the contract." *Id.* (citing *Gonzales v. Kil Nam Chun*, 465 N.E.2d 727, 729 (Ind. Ct. App. 1984)).

Construing the complaint broadly, Mr. Barnett contends that he is an intended third party beneficiary under the contract. The Indiana Supreme Court has explained the circumstances under which a third party to a contract may sue to enforce the contract:

> To be enforceable, it must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party. It is not enough that performance of the contract would be of benefit to the third party. It must appear that it was the intention of one of the parties to require performance of some part of it in favor of such third party and for his benefit, and that the other party to the agreement intended to assume the obligation thus imposed. The intent of the contracting parties to bestow rights upon a third party

13

must affirmatively appear from the language of the instrument when properly interpreted and construed.

*Cain v. Griffin*, 849 N.E.2d 507, 514 (Ind. 2006) (internal quotation omitted). A third-party beneficiary must show the following:

(1) A clear intent by the actual parties to the contract to benefit the third party;
(2) A duty imposed on one of the contracting parties in favor of the third party; and
(3) Performance of the contract terms is necessary to render the third party a direct benefit intended by the parties to the contract.

*Eckman v. Green*, 869 N.E.2d 493, 496 (Ind. Ct. App. 2007) (citing *Luhnow v. Horn*, 760 N.E.2d 621, 628 (Ind. Ct. App. 2001)). "The intent to benefit the third party is the controlling factor and may be shown by specifically naming the third party or by other evidence." *Id*.

Mr. Barnett has failed to make the requisite showing that he is an intended third-party beneficiary of the contract between Wexford and IDOC. Without such a showing, his breach of contract claim fails. Wexford is entitled to summary judgment on Mr. Barnett's Indiana state law claim of breach of contract.

### D. Intentional Infliction of Emotional Distress

Finally, Mr. Barnett asserts an Indiana state law tort claim for intentional infliction of emotional distress against Dr. Talbot. Dkt. 2 at 9. The tort of intentional infliction of emotional distress has four elements a plaintiff must prove: 1) the defendant must engage in extreme and outrageous conduct that 2) intentionally or recklessly 3) causes 4) severe emotional distress to another. *Doe v. Methodist Hosp.*, 690 N.E.2d 681, 691 (Ind. 1997) (citing Restatement (Second) of Torts § 46 (1965)). Liability for intentional infliction of emotional distress is found only if there is extreme and outrageous conduct. *Gable v. Curtis*, 673 N.E.2d 805, 809-10 (Ind. Ct. App. 1996). The intent to emotionally harm constitutes the basis of the tort. *Bradley v. Hall*, 720 N.E.2d 747, 752 (Ind. Ct. App. 1999).

Although Mr. Barnett is dissatisfied with the treatment he received from Dr. Talbot, he fails to show that Dr. Talbot engaged in extreme or outrageous conduct. The evidence does not reflect that Dr. Talbot outright ignored Mr. Barnett. Rather, it shows a course of continuous treatment that became more aggressive. Dr. Talbot is entitled to deference in his treatment decisions. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Thus, Dr. Talbot is entitled to summary judgment on Mr. Barnett's Indiana state law claim of intentional infliction of emotional distress.

## IV.
## Conclusion

For the foregoing reasons, the defendants' motion for summary judgment, dkt. [43], is **granted** as to all of Mr. Barnett's claims. Accordingly, this action is **dismissed with prejudice**. Final judgment consistent with this Order shall now enter.

**IT IS SO ORDERED.**

Date: 12/19/2019

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

CAMEUS BARNETT
988939
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com